Robert C. Schubert (S.B.N. 62684)
(rschubert@sjk.law)
Amber L. Schubert (S.B.N. 278696)
(aschubert@sjk.law)
Sonum Dixit (S.B.N. 353395)
(sdixit@sjk.law)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St., Suite 200
San Francisco, California 94123
Telephone: (415) 788-4220
Facsimile: (415) 788-0161

*Counsel for Plaintiff Elana Ramos and the Putative Class*

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO / OAKLAND DIVISION**

ELANA RAMOS, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

MERCOR.IO CORPORATION d/b/a MERCOR,

Defendant.

Case No. 3:26-cv-03215

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

Upon personal knowledge as to her own acts, and based upon her investigation, the investigation of counsel, and information and belief as to all other matters, Plaintiff Elana Ramos, on behalf of herself and all others similarly situated, alleges as follows:

## SUMMARY OF THE ACTION

1. Plaintiff brings this class action against Mercor.io Corporation d/b/a Mercor ("Defendant" or "Mercor") for its failure to adequately secure and safeguard her and numerous other individuals' personally identifiable information ("PII") including candidate profiles, employer data, user accounts and credentials, video interviews, proprietary information, source code, keys and secrets, and Tailscale VPN data.[1]

2. Mercor is a "platform that connects global talent with companies" through an "AI vetting process [that] identifies exceptional individuals from around the world and matches them with the best opportunities."[2]

3. Mercor's "AI assessment system drives instant sourcing between clients and experts" and allows it to "identify the best-fitting candidates across the globe at an accelerated rate."[3] Mercor claims that its "reliable AI vetting process helps [it] identify top-tier experts based on their skills and fit for every role available on our platform, and quickly connects these experts to appropriate client projects."[4]

4. Mercor "use[s] information provided by candidates to evaluate how well-suited they seem for specific roles."[5]

5. Mercor owes its contractors, users, and clients an affirmative duty to adequately protect and safeguard their PII against theft and misuse. Despite such duties created by statute,

---

[1] Ionut Aghire, *Mercor Hit by LiteLLM Supply Chain Attack*, SECURITYWEEK (APR. 2, 2026), https://www.securityweek.com/mercor-hit-by-litellm-supply-chain-attack/ (last visited Apr. 15, 2026).

[2] *Frequently Asked Questions*, MERCOR, https://work.mercor.com/faq (last visited Apr. 15, 2026).

[3] *Id.*

[4] *Id.*

[5] *Id.*

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

regulation, and common law, at all relevant times, Mercor utilized deficient data security practices, thereby allowing sensitive and private data to fall into the hands of strangers.

6. On March 31, 2026, Mercor publicly disclosed that "there was a recent security incident that affected our systems along with thousands of other organizations worldwide."[6]

7. Threat actors claimed to have exfiltrated "four terabytes of the company's data in their possession, including an unnamed database weighing over 200GB and a 3TB drive containing video and verification data[]" as well as "939GB of the company's source code and all data from the company's Tailscale VPN account."[7]

8. Defendant has not disclosed or clarified to Plaintiff and Class Members how many people were impacted in total, how exactly the Data Breach occurred, how the cybercriminals accessed Defendant's systems and the root cause of the Data Breach, whether the exfiltrated information was encrypted or anonymized, why it took so long to notify victims, or what specific remedial steps Defendant has taken to safeguard PII within its systems and networks (or otherwise purge unnecessary information) and to prevent further cyberattacks going forward. Without these critical details, Plaintiff and Class Members cannot meaningfully mitigate the resulting effects of the Data Breach.

9. The Data Breach was directly and proximately caused by Defendant's failure to implement reasonable and industry-standard data security practices necessary to protect its systems from a foreseeable and preventable cyberattack. Through this wrongful conduct, the sensitive PII of thousands of individuals is now in the hands of cybercriminals, who target this sensitive data for its value to identity thieves. Plaintiff and Class Members are now at a significantly increased and impending risk of fraud, identity theft, and similar forms of criminal mischief—risks which may last the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes. Moreover, Plaintiff and Class Members have lost the inherent value of their private data.

---

[6] Exhibit A.

[7] Vilius Petkauskas, *Mercor confirms cyberattack as hackers claim 4TB of critical data in possession*, CYBERNEWS (APR. 1, 2026), https://cybernews.com/security/mercor-data-breach-litelllm-supply-chain-attack/ (last visited Apr. 15, 2026).

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

10. By aggregating information obtained from the Data Breach with other sources or other methods, criminals can assemble a full dossier of private information on an individual to facilitate a wide variety of frauds, thefts, and scams. Criminals can and do use victims' names and other personal information to open new financial accounts, incur credit charges, obtain government benefits and identifications, fabricate identities, and file fraudulent tax returns well before the person whose PII was stolen becomes aware of it. Any one of these instances of identity theft can have devastating consequences for the victim, causing years of often irreversible damage to their credit scores, financial stability, and personal security.

11. Plaintiff received a notification of the Data Breach from Defendant on or around March 31, 2026.[8]

12. As a result of Defendant's conduct and the resulting Data Breach, Plaintiff's and Class Members' privacy has been invaded, their PII is now in the hands of criminals, they have either suffered or will suffer fraud or identity theft, or face an imminent and ongoing risk of identity theft and fraud. Accordingly, these individuals now must take immediate and time-consuming action to protect themselves from such identity theft and fraud.

13. Plaintiff, on behalf of herself and all others similarly situated, herein alleges claims for negligence, breach of implied contract, and violation of California's Unfair Competition Law. Plaintiff on behalf of herself and the Class, seeks: (i) actual damages, economic damages, statutory damages, and nominal damages; (ii) punitive damages; (iii) fees and costs of litigation; (iv) injunctive relief, including the adoption of reasonably sufficient practices to safeguard PII in Defendant's custody, care, and control in order to prevent incidents like the Data Breach from recurring in the future and for Defendant to provide long-term identity theft protective services to Plaintiff and Class Members; and (v) such other relief as the Court deems just and proper.

## PARTIES

### A. Plaintiff

14. Plaintiff Elana Ramos is a resident and citizen of Florida.

---

[8] *See* Exhibit A.

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

**B. Defendant**

15. Defendant Mercor.io Corporation is a Delaware corporation with its principal place of business located at 181 Fremont Street, Floor 33, Suite 2600, San Francisco, California 94105.

**JURISDICTION AND VENUE**

16. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because at least one member of the putative Class, as defined below, is a citizen of a state other than that of Defendant, there are more than 100 putative Class Members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

17. This Court has general personal jurisdiction over Defendant because it maintains its principal place of business in San Francisco, California, and regularly conducts business in California, and has sufficient minimum contacts in California, such as to not offend traditional notions of fair play and substantial justice.

18. Venue in this District is proper under 28 U.S.C. § 1391 because Mercor resides in this District and a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District, including Defendant collecting or storing the PII of Plaintiff and the putative Class Members.

19. Divisional Assignment: This action arises in San Francisco County, in that a substantial part of the events which give rise to the claims asserted herein occurred in San Francisco County, where Mercor is headquartered and located. Pursuant to L.R. 3-2(d), all civil actions that arise in San Francisco County shall be assigned to the San Francisco or Oakland Division.

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

## FACTUAL BACKGROUND

### A. Mercor Collects, Stores, and Maintains Personally Identifiable Information

20. "Founded in 2023, Mercor works with companies, including OpenAI and Anthropic, to train AI models by contracting specialized domain experts such as scientists, doctors, and lawyers from markets, including India."[9]

21. Defendant claims "it facilitates more than $2 million in daily payouts and was valued at $10 billion following a $350 million Series C round led by Felicis Ventures in October 2025."[10]

22. Mercor "hires massive networks of human contractors to generate bespoke, proprietary datasets for these labs, which are typically kept highly secret as they're a core ingredient in the recipe to generate valuable AI models that power products like ChatGPT and Claude Code."[11]

23. In providing these services, Mercor routinely collects contractors' and applicants' sensitive PII, such as resume or CV, interview video/audio and AI transcripts, written feedback from companies (if applicable), results of background checks (if authorized), email, login credentials, profile photo, location, work preferences, and compensation expectations, public profile information (e.g., LinkedIn, GitHub), and offer, payment, and tax details (if provided).[12]

24. Mercor states that it uses the above data to "provide feedback and power job matches," conduct AI interviews, and recommend profiles to prospective employers.[13] The data is

---

[9] Jagmeet Singh, *Mercor says it was hit by cyberattack tied to compromise of open source LiteLLM project*, TECHCRUNCH (MAR. 31, 2026), https://techcrunch.com/2026/03/31/mercor-says-it-was-hit-by-cyberattack-tied-to-compromise-of-open-source-litellm-project/ (last visited Apr. 15, 2026).

[10] *Id.*

[11] Maxwell Zeff *et al.*, *Meta Pauses Work With Mercor After Data Breach Puts AI Industry Secrets at Risk*, WIRED (APR. 3, 2026), https://www.wired.com/story/meta-pauses-work-with-mercor-after-data-breach-puts-ai-industry-secrets-at-risk/ (last visited Apr. 15, 2026).

[12] *How Mercor Uses AI and Data*, MERCOR, https://talent.docs.mercor.com/policies/data-ai-usage (last visited Apr. 15, 2026).

[13] *Id.*

also used to train Mercor's internal recommendation models and improve the performance of Mercor's platform.[14]

25. Mercor also generates revenue by "appl[ying] a margin to companies' pay rates once you accept a role. This fee compensates us for sourcing, vetting, and placing candidates. In summary, we only generate revenue when you are successfully placed on a project. Our AI models are specifically designed to optimize the likelihood of matching you with suitable employment opportunities."[15]

26. Mercor's Trust Center states: "Mercor securely stores all submitted data, including resumes, interview transcripts, and feedback. Your profile visibility is under your control, and data is never used to train third-party AI models. Mercor uses AI to enhance job matching and interview evaluation, with occasional human review that does not influence hiring decisions."[16]

27. Furthermore, "[a]ll collected data is handled in accordance with applicable privacy laws and internal policies. Data is used solely for its intended purpose, and access is restricted to authorized personnel. We implement robust security measures—including encryption, access controls, and regular audits—to protect data from unauthorized access, disclosure, or misuse."[17]

28. Mercor is aware of the sensitive nature of the PII it collects, and it acknowledges the importance of data privacy.

29. Mercor's public-facing statements on privacy and security make it clear that it is aware of the need to safeguard the sensitive PII entrusted to it by users as part of providing its communication services.

30. Despite these strong proclaimed proactive policies and approaches to data security and privacy for their customers, Defendant failed to adequately secure and safeguard its systems and networks from a foreseeable and preventable cyberattack. This conduct proximately resulted in the Data Breach and significant harm to Plaintiff and the Class.

---

[14] *Id.*

[15] *Id.*

[16] *Mercor's Trust Center*, MERCOR, https://trust.mercor.com (last visited Apr. 15, 2026).

[17] *Id.*

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

**B. <u>The Data Breach Exposed Valuable PII</u>**

31. On March 31, 2026, Mercor publicly disclosed that it was "one of thousands of companies affected by a recent compromise of LiteLLM's project, which was linked to a hacking group called TeamPCP."[18]

32. "Using a maintainer's compromised credentials, the TeamPCP hacking group published two malicious LiteLLM PyPI package versions, namely 1.82.7 and 1.82.8, which were available for download for roughly 40 minutes."[19]

33. "For 40 minutes, the [LiteLLM] tool harbored credential harvesting malware — rogue software that could steal login credentials. Those credentials were used to gain access to more software and accounts, which it used to harvest more credentials, and so on."[20]

34. Mercor informed its contractors that "[t]here was a recent security incident that affected our systems along with thousands of other organizations worldwide."[21]

35. The Lapsus$ extortion group posted on its leak site "four terabytes of the company's data in their possession, including an unnamed database weighing over 200GB and a 3TB drive containing video and verification data[]" as well as "939GB of the company's source code and all data from the company's Tailscale VPN account."[22]

---

[18] Jagmeet Singh, *Mercor says it was hit by cyberattack tied to compromise of open source LiteLLM project*, TECHCRUNCH (MAR. 31, 2026), https://techcrunch.com/2026/03/31/mercor-says-it-was-hit-by-cyberattack-tied-to-compromise-of-open-source-litellm-project/ (last visited Apr. 15, 2026).

[19] Ionut Arghire, *Mercor Hit by LiteLLM Supply Chain Attack*, SECURITYWEEK (APR. 2, 2026), https://www.securityweek.com/mercor-hit-by-litellm-supply-chain-attack/ (last visited Apr. 15, 2026).

[20] Julie Bort, *After data breach, $10B-valued startup Mercor is having a month*, TECHCRUNCH (APR. 9, 2026), https://techcrunch.com/2026/04/09/after-data-breach-10b-valued-startup-mercor-is-having-a-month/ (last visited Apr. 15, 2026).

[21] Exhibit A.

[22] Vilius Petkauskas, *Mercor confirms cyberattack as hackers claim 4TB of critical data in possession*, CYBERNEWS (APR. 1, 2026), https://cybernews.com/security/mercor-data-breach-litelllm-supply-chain-attack/ (last visited Apr. 15, 2026).

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

36. The impacted data includes candidate profiles, personally identifiable information, employer data, source code, and API keys.[23]

37. The cybercriminal groups TeamPCP and Lapsus$ reportedly collaborated on this supply chain attack.[24]

38. Defendant did not notify affected individuals until on or around March 31, 2026[25] and has not notified states' attorneys general about the Data Breach.

39. As a result of the Data Breach, "OpenAI is investigating the startup's security incident to see how its proprietary training data may have been exposed" and Meta has indefinitely paused its work with Mercor while investigating the Data Breach.[26]

40. Despite Defendant's duties and commitments to safeguard sensitive and private information, Defendant failed to follow industry-standard practices in securing Plaintiff's and the Class Members' PII, as evidenced by the Data Breach.

41. Defendant has not provided any details about the dates of the breach, the duration of the breach, the root cause of the Data Breach, the vulnerabilities exploited, the criminals responsible for the breach, and the remedial measures undertaken to ensure such a breach does not occur again. To date, Defendant has not explained or disclosed these facts to Plaintiff and Class Members.

42. Without these details, Plaintiff's and Class Members' ability to mitigate harms resulting from the Data Breach is severely diminished.

### C. <u>Defendant Had Ample Notice That It Was a Likely Cyberattack Target</u>

43. At all relevant times, Defendant knew, or should have known, that the PII it was entrusted with was a target for malicious actors. Defendant knew this given the unique type and the

---

[23] Bort, *supra* note 20.

[24] Beatrice Nolan, *Mercor, a $10 billion AI startup that works with companies including OpenAI and Anthropic, confirms major data breach*, FORTUNE (APR. 2, 2026), https://fortune.com/2026/04/02/mercor-ai-startup-security-incident-10-billion/ (last visited Apr. 15, 2026).

[25] Exhibit A.

[26] Maxwell Zeff *et al.*, *Meta Pauses Work With Mercor After Data Breach Puts AI Industry Secrets at Risk*, WIRED (APR. 3, 2026), https://www.wired.com/story/meta-pauses-work-with-mercor-after-data-breach-puts-ai-industry-secrets-at-risk/ (last visited Apr. 15, 2026).

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

significant volume of data on its networks, servers, and systems, comprising individuals' detailed and confidential personal information and, thus, the significant number of individuals who the exposure of the PII would harm.

44. As custodian of Plaintiff's and Class Members' PII, Defendant knew or should have known the importance of protecting its PII, and of the foreseeable consequences and harms to such persons if any data breach occurred.

45. According to the Consumer Financial Protection Bureau, the number of data breach and identity theft complaints it received grew from 14,319 in 2020 to 32,469 in 2022.[27] It is well known among companies that PII such as social security numbers and financial information is valuable and frequently targeted by criminals.

46. "Several attacks have affected HR recruiting operations in recent years. Background screening services provider DISA Global Solutions, Inc. disclosed a breach in early 2025 affecting more than 3.3 million users. And last August, a breach of a Michigan ManpowerGroup franchise potentially exposed the personal information of 145,000 customers."[28]

47. According to Michelle Reed, partner with Akin Gump and co-leader of the firm's cybersecurity, privacy and data protection practice, "What organizations don't realize is that people can export that data and save it to all kinds of places," and "HR data is common on the dark web because criminals know they can get it on the HR shared drive."[29]

---

[27] *See Compromised: Why experts say data breaches are on the rise,* NBC 6 SOUTH FLORIDA, https://www.nbcmiami.com/responds/compromised-why-experts-say-data-breaches-are-on-the-rise/3473306/ (last visited June 5, 2025).

[28] Ryan Golden, *AI industry recruiting platform faces multiple lawsuits over data breach*, HR DIVE (APR. 13, 2026), https://www.hrdive.com/news/ai-industry-recruiting-platform-faces-multiple-lawsuits-data-breach/817319/ (last visited Apr. 15, 2026).

[29] Brian Eastwood, *HR data is sought after on the dark web. How can employers protect worker info?*, HR DIVE (NOV. 8, 2022), https://www.hrdive.com/news/hr-role-cybersecurity-employee-data/636034/ (last visited Apr. 15, 2026).

48. The Federal Trade Commission has warned consumers that identity thieves use PII to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[30]

49. Criminals can commit all types of fraud, including: obtaining a driver's license or official identification card in the victim's name but the thief's picture, using the victim's name and SSN to obtain government benefits, to obtain lending or lines of credit, filing a fraudulent tax return using the victim's information. Identity thieves may obtain a job using the victim's social security number, rent a house, or give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[31]

50. "TeamPCP (aka PCPcat, ShellForce, DeadCatx3) has conducted operations dating back to at least September 2025 [and] gained notoriety in December 2025, in the wake of the massive React2Shell campaign that targeted cloud environments."[32]

51. "TeamPCP is known for engineering so-called supply-chain attacks, in which malware is planted inside codebases or software libraries that are widely used by programmers when writing their own code."[33]

52. "While [TeamPCP] initially focused on ransomware, it also has roots in cryptocurrency mining and cryptocurrency theft. The group has more recently shifted toward smash and grab supply chain compromise operations starting in mid March 2026."[34]

---

[30] *See* What to Know About Identity Theft, FEDERAL TRADE COMMISSION (Sept. 2024), https://consumer.ftc.gov/articles/what-know-about-identity-theft (last visited June 5, 2025).

[31] *See Warning Signs of Identity Theft*, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed June 5, 2025).

[32] *Weaponizing the Protectors: TeamPCP's Multi-Stage Supply Chain Attack on Security Infrastructure*, PALO ALTO NETWORKS (APR. 9, 2026), https://unit42.paloaltonetworks.com/teampcp-supply-chain-attacks/ (last visited Apr. 15, 2026).

[33] Nolan, *supra* note 24.

[34] PALO ALTO NETWORKS, *supra* note 32.

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

53. "Mandiant CTO Charles Carmakal stated that over 1,000 SaaS environments were actively dealing with cascading effects from TeamPCP's attacks, potentially expanding to 10,000+."[35]

54. "The NSA, CISA, and FBI published joint guidance on March 18 . . . treating AI supply chain security as a distinct discipline for the first time."[36]

55. "Black Duck's 2026 [Open Source Security and Risk Analysis Report] found average open-source vulnerabilities per application surged 107% to 581 per codebase."[37]

56. "Lapsus$ . . . is an older hacking group, known for social engineering and phishing attacks that focus on stealing user log-in credentials and then using those credentials to gain access to and steal sensitive data."[38]

57. Lapsus$'s previous targets include Microsoft, Nvidia, Samsung, Okta, Uber, Rockstar Games, the Brazilian Ministry of Health, the Argentinian e-company Mercado Libre, Ubisoft, and T-Mobile.[39]

58. Defendant's security obligations were especially important due to the substantial increase of cyberattacks and data breaches in recent years.

59. Defendant knew or should have known that as an AI-based recruitment platform that works with prominent technology companies, it is a prime target of supply chain attacks. Defendant also knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack.

---

[35] Justin Beals, *The Mercor breach exposed Silicon Valley's fragile AI supply chain*, STRIKEGRAPH (APR. 8, 2026), https://www.strikegraph.com/blog/the-mercor-breach-exposed-silicon-valleys-fragile-ai-supply-chain.

[36] *Id.*

[37] *Id.*

[38] Nolan, *supra* note 24.

[39] Patrick Barnett, *A New Threat Actor Group Emerges: Understanding Lapsus$*, ISACA (SEPT. 3, 2024), https://www.isaca.org/resources/news-and-trends/industry-news/2024/a-new-threat-actor-group-emerges-understanding-lapsus (last visited Apr. 15, 2026).

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

**D. Defendant Breached Its Duties to Plaintiff and Class Members, and Failed to Comply with Regulatory Requirements and Industry Practices.**

60. Because Defendant was entrusted with PII at all times herein relevant, Defendant owed to Plaintiff and the Class a duty to exercise commercially reasonable methods and care in handling, using, maintaining, storing, and safeguarding the PII in its care, control, and custody, including by implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that occurred, and to promptly detect and thwart attempts at unauthorized access to their networks and systems. Defendant also owed a duty to safeguard PII because it was on notice that it was handling highly valuable data and knew there was a significant risk it would be targeted by cybercriminals. Furthermore, Defendant knew of the extensive, foreseeable harm that would ensue for the victims of a data breach, and therefore also owed a duty to reasonably safeguard that information.

61. Security standards commonly accepted among businesses like Defendant that store PII include, without limitation:

i. Maintaining a secure firewall configuration;

ii. Monitoring for suspicious or irregular traffic to servers or networks;

iii. Monitoring for suspicious credentials used to access servers or networks;

iv. Monitoring for suspicious or irregular activity by known users;

v. Monitoring for suspicious or unknown users;

vi. Monitoring for suspicious or irregular server requests;

vii. Monitoring for server requests for PII;

viii. Monitoring for server requests from VPNs; and

ix. Monitoring for server requests for Tor exit nodes.

62. The U.S. Federal Trade Commission ("FTC") publishes guides for businesses for cybersecurity[40] and protection of PII which includes basic security standards applicable to all types of businesses.[41]

63. The FTC recommends that businesses:

i. Identify all connections to the computers where sensitive information is stored.

ii. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

iii. Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

iv. Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

v. Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hacker attacks.

vi. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

vii. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from

---

[40] *Start with Security: A Guide for Business*, FTC (June 2015), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[41] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.



SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

viii. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

ix. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

64. As described further below, Defendant owed a duty to safeguard PII under the Federal Trade Commission Act, 15 U.S.C. § 45 (the "FTC Act") to ensure that all information it received, maintained, and stored was secure. This statute was enacted to protect Plaintiff and the Class Members from the type of conduct in which Defendant engaged, and the resulting harms Defendant proximately caused Plaintiff and the Class Members.

65. Under the FTC Act, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard the PII of Plaintiff and Class Members.

66. Defendant breached its duty to exercise reasonable care in protecting Plaintiff's and Class Members' PII by failing to implement and maintain adequate data security measures to safeguard Plaintiff's and Class Members' sensitive personal information, failing to encrypt or anonymize PII within its systems and networks, failing to monitor its systems and networks to promptly identify and thwart suspicious activity, allowing unmonitored and unrestricted access to unsecured PII, and allowing (or failing to prevent) unauthorized access to, and exfiltration of, Plaintiff's and Class Members' confidential and private information. Additionally, Defendant

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

breached its duty by utilizing outdated and ineffectual data security measures which deviated from standard industry best practices at the time of the Data Breach. Through these actions, Defendant also violated its duties under the FTC Act.

67. Defendant failed to prevent the Data Breach. Had Defendant properly maintained and adequately protected its systems, servers, and networks, the Data Breach would not have occurred.

68. Additionally, the law imposes an affirmative duty on Defendant to timely disclose the unauthorized access and theft of PII to Plaintiff and Class Members so that it can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuses of their private information. Defendant further breached its duties by failing to provide timely notice of the Data Breach to Plaintiff and Class Members. In so doing, Defendant actually and proximately caused and exacerbated the harm from the Data Breach and the injuries-in-fact of Plaintiff and Class Members.

**E. <u>The Experiences of Plaintiff</u>**

69. Plaintiff is a contractor for Mercor and received notice of the Data Breach via email on or around March 31, 2026.[42]

70. Plaintiff has noticed a significant uptick in spam over the past few weeks and froze her credit when she learned of the Data Breach.

71. Plaintiff trusted that Defendant would use reasonable measures to protect her data according to state and federal law.

72. As a proximate result of the Data Breach, Plaintiff will spend time for the foreseeable future and beyond dealing with its consequences and self-monitoring her accounts and credit reports to monitor potentially suspicious and fraudulent activity. This time will be lost forever and cannot be recaptured.

73. Plaintiff has and is experiencing fear, stress, and frustration because her sensitive information was stolen in the Data Breach, and not knowing by whom or for what purpose. This goes beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a data breach victim that the law contemplates and addresses.

[42] *See* Exhibit A.

74. Plaintiff's Data Breach Notice does not list the type of information exfiltrated nor does it provide any information on mitigation measures.

75. Plaintiff suffered actual injuries in the form of damages to and diminution in the value of her PII—a form of intangible property that was entrusted to Defendant—which was compromised in and as a proximate result of the Data Breach.

76. Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse proximately resulting from her PII being obtained by unauthorized third parties and possibly cybercriminals.

77. Plaintiff has a continuing interest in ensuring that her PII, which remains within Defendant's possession and control, is protected and safeguarded against future data breaches or cybersecurity risks.

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

### F. <u>Plaintiff and the Class Suffered Actual and Impending Injuries Resulting From the Data Breach</u>

78. As a proximate result of Defendant's completely unreasonable security practices, identity thieves now possess the sensitive PII of Plaintiff and the Class. That information is extraordinarily valuable on the black market and incurs direct costs to Plaintiff and the Class. On the dark web—an underground Internet black market—criminals openly buy and sell stolen PII to create "identity kits" worth up to $2,000 each that can be used to create fake IDs, gain access to bank accounts, social media accounts, and credit cards, file false insurance claims or tax returns, or rack up other kinds of expenses.[43] And, "[t]he damage to affected [persons] may never be undone."[44]

79. Unlike the simple credit-card breaches at retail merchants, these damages cannot be avoided by canceling and reissuing plastic cards or closing an account. Identity theft is far more pernicious than credit card fraud. Criminals' ability to open entirely new accounts—not simply prey on existing ones—poses far more dangerous problems. Identity thieves can retain the stolen

---

[43] Nick Culbertson, *Increased Cyberattacks on Healthcare Institutions Shows the Need for Greater Cybersecurity* (Jun. 7, 2021), FORBES, https://www.forbes.com/sites/forbestechcouncil/2021/06/07/increased-cyberattacks-on-healthcare-institutions-shows-the-need-for-greater-cybersecurity/?sh=ca928c05650d.

[44] *Id.*

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

information for years until the controversy has receded because victims may become less vigilant in monitoring their accounts as time passes. Then, at any moment, the thief can take control of a victim's identity, resulting in thousands of dollars in losses and lost productivity. The U.S. Department of Justice has reported that in 2021, identity theft victims spent on average about four hours to resolve problems stemming therefrom and that the average financial loss experienced by an identity theft victim was $1,160 per person.[45] Additionally, about 80% of identity theft victims reported some form of emotional distress resulting from the incident.[46]

80. As a consequence of the Data Breach, Class Members' credit profiles can be destroyed before they even realize what happened, and they may be unable to legitimately borrow money, obtain credit, or open bank accounts. Class Members can be deprived of legitimate tax refunds or, worse yet, may face state or federal tax investigations due to fraud committed by an identity thief. And even the simple preventive step of adding oneself to a credit-fraud watch list to guard against these consequences substantially impairs Class Members' ability to obtain additional credit. In fact, many experts advise victims to place a freeze on all credit accounts, making it impossible to rent a car, get student loans, buy or rent big-ticket items, or complete a major new car or home purchase.

## CLASS ACTION ALLEGATIONS

81. Pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3), and where applicable, 23(c)(4), Plaintiff seeks certification of the following Class (the "Class"):

> All persons in the United States whose PII was compromised as a result of the Data Breach (and each person a "Class Member").

82. Excluded from the Class are governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded

---

[45] Erika Harrell and Alexandra Thompson, Victims of Identity Theft, 2021, U.S. DEPARTMENT OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, BUREAU OF JUSTICE STATISTICS (Oct. 2023), *available at* https://bjs.ojp.gov/document/vit21.pdf.

[46] *Id.*

from the Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

83. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and 23(b)(3), and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of these rules.

84. _Numerosity Under Rule 23(a)(1)_. The Class is so numerous that the individual joinder of all members is impracticable, and the disposition of the claims of all members of the Class in a single action will provide substantial benefits to the parties and the Court. Plaintiff believes the Class is comprised of thousands of individuals. The Class is sufficiently numerous to warrant certification.

85. _Commonality Under Rule 23(a)(2)_. Common legal and factual questions exist that predominate over any questions affecting only individual members of the Class. These common questions, which do not vary among members of the Class and which may be determined without reference to any Class Member's individual circumstances, include, but are not limited to:

a. Whether Defendant knew or should have known that its computer systems and networks were vulnerable to unauthorized third-party access or a cyberattack;

b. Whether Defendant failed to utilize and maintain adequate and reasonable security and preventive measures to ensure that its computer systems and networks were protected;

c. Whether Defendant failed to take available steps to prevent and stop the Data Breach from occurring;

d. Whether Defendant failed to comply with its own policies and applicable laws, regulations and industry standards relating to data security;

e. Whether Defendant owed a legal duty to Plaintiff and Class Members to protect their PII;

f. Whether Defendant breached any duty to protect the PII of Plaintiff and Class Members by failing to exercise due care in protecting their sensitive and private information;

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

g. Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the loss of the PII of Plaintiff and Class Members.

h. Whether Defendant provided timely, accurate, and sufficient notice of the Data Breach to Plaintiff and the Class Members;

i. Whether Plaintiff and Class Members have been damaged by the wrongs alleged and are entitled to actual, statutory, or other forms of damages and other monetary relief; and

j. Whether Plaintiff and Class Members are entitled to injunctive or equitable relief, including restitution.

86. *Typicality Under Rule 23(a)(3)*. Plaintiff's claims are typical of the claims of the Class. Plaintiff had her PII compromised in the Data Breach. Defendant's uniformly unlawful course of conduct injured Plaintiff and Class Members.

87. *Adequacy of Representation Under Rule 23(a)(4)*. Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and consumer protection class action matters such as this action, and Plaintiff and her counsel intend to vigorously prosecute this action for the Class's benefit and have the resources to do so. Plaintiff and her counsel have no interests adverse to those of the other members of the Class.

88. *Predominance and Superiority*. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because individual litigation of each Class Member's claim is impracticable. The damages, harm, and losses suffered by the individual members of the Class will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's wrongful conduct. Even if each Class Member could afford individual litigation, the Court system could not. It would be unduly burdensome if tens of thousands of individual cases or more proceeded. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those individuals with

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the Courts because it requires individual resolution of common legal and factual questions. By contrast, the class action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

89. As a result of the foregoing, class treatment under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and (c)(4) is appropriate.

**FIRST CAUSE OF ACTION**
**Negligence**
***(On Behalf of Plaintiff and the Class)***

90. Plaintiff incorporates the above allegations as if fully set forth herein.

91. Because Defendant was entrusted with such PII at all times herein relevant, it owed to Plaintiff and the Class a duty to exercise commercially reasonable methods and care in handling, using, maintaining, storing, and safeguarding the PII in its care, control, and custody, including by implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that occurred, and to promptly detect and thwart attempts at unauthorized access to their networks and systems. This duty arose independently from any contract.

92. Defendant knew, or should have known, of the risks inherent in collecting and storing massive amounts of PII, including the importance of adequate data security and the high frequency of ransomware attacks and well-publicized data breaches. Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure to adequately safeguard its PII in accordance with state-of-the-art industry standards concerning data security would result in the compromise of that sensitive information. Indeed, on its website, Mercor commits to data privacy, including safeguarding PII.

93. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and the Class's PII by failing to limit access to this information to unauthorized third parties and by not properly supervising both the way the PII was stored, used, and exchanged, and those in its employ responsible for such tasks.

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

94. Defendant owed to Plaintiff and members of the Class a duty to notify them within a reasonable timeframe of any breach to the security of their PII. Defendant also owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and circumstances of the Data Breach. This duty is required and necessary for Plaintiff and the Class to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

95. Defendant also had a common law duty to prevent foreseeable harm to others. Defendant had full knowledge of the sensitivity and high value of the PII that it stored and the types of foreseeable harm and injury-in-fact that Plaintiff and Class Members could and would suffer if that PII were wrongfully disclosed, leaked, accessed, or exfiltrated. Defendant's conduct created a foreseeable and unreasonable risk of harm to Plaintiff and Class Members, who were the foreseeable victims of Defendant's inadequate data security practices.

96. Defendant violated its duty to implement and maintain reasonable security procedures and practices, including through its failure to adequately restrict access to its systems that held millions of individuals' PII or encrypt or anonymize such data. Defendant's duty included, among other things, designing, maintaining, and testing their information security controls to ensure that PII in its possession was adequately secured by, for example, encrypting or anonymizing sensitive personal information, installing intrusion detection and deterrent systems and monitoring mechanisms, and using access controls to limit access to sensitive data.

97. Defendant's duty of care also arose pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act"), under which Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard the PII of Plaintiff and Class Members.

98. The FTC Act was enacted to protect Plaintiff and the Class Members from the type of wrongful conduct in which Defendant engaged.

99. Defendant's violation of the FTC Act constitutes negligence *per se* for purposes of establishing the duty and breach elements of Plaintiff's negligence claim. Those statutes were designed to protect a group to which Plaintiff belongs and to prevent the types of harm that resulted from the Data Breach.

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

100. Defendant breached its duty to exercise reasonable care in protecting Plaintiff's and Class Members' PII by failing to implement and maintain adequate data security measures to safeguard Plaintiff's and Class Members' sensitive personal information, failing to encrypt or anonymize PII within its systems and networks, failing to monitor its systems and networks to promptly identify and thwart suspicious activity, failing to delete and purge PII no longer necessary for its provision of services to its users, allowing unmonitored and unrestricted access to unsecured PII, and allowing (or failing to prevent) unauthorized access to, and exfiltration of, Plaintiff's and Class Members' confidential and private information. Additionally, Defendant breached its duty by utilizing outdated and ineffectual data security measures which deviated from standard industry best practices at the time of the Data Breach. Through these actions, Defendant also violated its duties under the FTC Act.

101. The law imposes an affirmative duty on Defendant to timely disclose the unauthorized access and theft of PII to Plaintiff and Class Members so that they can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuses of their private information. Defendant further breached its duties by failing to provide timely notice of the Data Breach to Plaintiff and Class Members. In so doing, Defendant actually and proximately caused and exacerbated the harm from the Data Breach and the injuries-in-fact of Plaintiff and Class Members. Timely disclosure was necessary so that Plaintiff and Class Members could, among other things: (i) purchase identity theft protection, monitoring, and recovery services; (ii) flag asset, credit, and tax accounts for fraud; (iii) purchase or otherwise obtain credit reports; (iv) place or renew fraud alerts on a quarterly basis; (v) closely monitor loan data and public records; and (vi) take other meaningful steps to protect themselves and attempt to avoid or recover from identity theft and other harms.

102. Plaintiff and Class Members had no ability to protect their PII once it was in Defendant's possession and control. Defendant was in an exclusive position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

103. But for Defendant's breach of duty to adequately protect Class Members' PII, Class Members' PII would not have been stolen. As a result of Defendant's negligence, Plaintiff and Class

Members suffered and will continue to suffer the various types of damages alleged herein. There is a temporal and close causal connection between Defendant's failure to implement adequate data security measures, the Data Breach, and the harms suffered by Plaintiff and Class Members.

104. As a direct and traceable result of Defendant's negligence, Plaintiff and the Class have suffered or will suffer an increased and impending risk of fraud, identity theft, damages, embarrassment, humiliation, frustration, emotional distress, and lost time and out-of-pocket costs to mitigate and remediate the effects of the Data Breach. These harms to Plaintiff and the Class include, without limitation: (i) loss of the opportunity to control how their personal information is used; (ii) diminution in the value and use of their personal information entrusted to Defendant; (iii) the compromise and theft of their personal information; (iv) out-of-pocket costs associated with the prevention, detection, and recovery from identity theft and unauthorized use of financial accounts; (v) costs associated with the ability to use credit and assets frozen or flagged due to credit misuse, including increased costs to use credit, credit scores, credit reports, and assets; (vi) unauthorized use of compromised personal information to open new financial and other accounts; (vii) continued risk to their personal information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the personal information in its possession; and (viii) future costs in the form of time, effort, and money they will expend to prevent, detect, contest, and repair the adverse effects of their personal information being stolen in the Data Breach.

105. Defendant's negligence was gross, willful, wanton, and warrants the imposition of punitive damages given the clear foreseeability of a hacking incident, the extreme sensitivity of the private information under Defendant's care, and its failure to take adequate remedial steps, including prompt notification of the victims, following the Data Breach.

106. Plaintiff and Class Members are entitled to all forms of monetary compensation set forth herein, including monetary payments to provide adequate long-term identity protection services. Plaintiff and Class Members are also entitled to the injunctive relief sought herein.

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

## SECOND CAUSE OF ACTION
**Breach of Implied Contract**
***(On Behalf of Plaintiff and the Class)***

107. Plaintiff incorporates the above allegations as if fully set forth herein.

108. Plaintiff and Class Members entered into an implied contract with Defendant when they entrusted Defendant with their PII as a precondition for working as contractors for Defendant.

109. Pursuant to these contracts, Plaintiff and Class Members provided Defendant with their PII. In exchange, Defendant agreed to: (1) provide an AI-based recruitment platform and various contracts to Plaintiff and Class Members, (2) use Plaintiff's and Class Members' PII to facilitate providing said AI-based recruitment platform involving Plaintiff and Class Members, (3) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class Members' PII; and (4) protect Plaintiff's and Class Members' PII in compliance with federal and state laws and regulations, industry standards, and Defendant's representations regarding its security and privacy practices.

110. As part of these transactions, Defendant agreed to safeguard and protect the PII of Plaintiff and Class Members and to timely and accurately notify them if their PII was breached or compromised.

111. Plaintiff and Class Members entered into the implied contracts with the reasonable expectation that Defendant's data security practices and policies were reasonable and consistent with the legal requirements, industry standards, and Defendant's own representations. Plaintiff and Class Members believed that Defendant would use part of the monies obtained from the benefits derived from the PII they provided to fund proper and reasonable data security practices.

112. Defendant acquired, stored, and maintained the PII of Plaintiff and the Class.

113. Plaintiff and Class Members were required to provide, or authorize the transfer of, their PII in order for Defendant to provide its services.

114. Defendant solicited, offered, and invited Class Members to provide their PII as part of its regular business practices. Plaintiff and Class Members accepted Defendant's offer and provided their PII to Defendant.

115. When Plaintiff and Class Members provided their PII to Defendant, they entered into implied contracts with Defendant and intended and understood that PII would be adequately safeguarded as part of that service.

116. Implicit in the agreement between Defendant, Plaintiff, and Class Members was the obligation that both parties would maintain information confidentially and securely.

117. These exchanges constituted an agreement and meeting of the minds between the parties.

118. Defendant's implied promise of confidentiality to Plaintiff and Class Members includes consideration beyond those pre-existing general duties owed under the FTC Act, or other state or federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

119. Defendant's implied promises include but are not limited to: (a) taking steps to ensure that any agents who are granted access to PII also protect the confidentiality of that data; (b) restricting access to qualified and trained agents; (c) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (d) applying or requiring proper encryption; (e) multifactor authentication for access; (f) protecting Plaintiff's and Class Members' PII in compliance with federal and state laws and regulations and industry standards; and (g) other steps to protect against foreseeable data breaches.

120. Defendant's implied promises to safeguard Plaintiff's and Class Members' PII are evidenced by representations on Defendant's website. The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant on the other, is further demonstrated by their conduct and course of dealing.

121. When the parties entered into an agreement, mutual assent occurred. Plaintiff and the Class Members would not have entrusted their PII to Defendant in the absence of such an implied contract. Had Defendant disclosed to Plaintiff and the Class that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and the other Class Members would not have provided their PII to Defendant.

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

122. Defendant recognized that Plaintiff's and Class Members' PII is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and the other Class Members.

123. Plaintiff and the Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

124. Defendant breached the implied contracts it made with its users by failing to take reasonable measures to safeguard their PII as described herein, as well as by failing to provide accurate, adequate, and timely notice to them that their PII was compromised as a result of the Data Breach.

125. As a direct and proximate result of Defendant's wrongful conduct, Plaintiff and the other Class Members suffered and will continue to suffer damages from: (i) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm, (ii) the loss of the confidentiality of the stolen PII, (iii) the illegal sale of the compromised data on the dark web, (iv) lost work time, and (v) other economic and non-economic harms.

126. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to strengthen its data security systems, submit to future audits of those systems, and provide adequate long-term credit monitoring and identity theft protection services to all persons affected by the Data Breach.

**<u>THIRD CAUSE OF ACTION</u>**
**Injunctive/Declaratory Relief**
***(On Behalf of Plaintiff and the Class)***

127. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described herein.

128. Defendant owes a duty of care to Plaintiff and Class Members, which required Defendant to adequately monitor and safeguard Plaintiff's and Class Members' PII.

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

129. Defendant and its officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns still possess the PII belonging to Plaintiff and Class Members.

130. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and the Class continue to suffer injury as a result of the compromise of their PII and the risk remains that further compromises of their private information will occur in the future.

131. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owes a legal duty to adequately secure the PII of Plaintiff and the Class within its care, custody, and control under the common law, and Section 5 of FTC Act;

b. Defendant breached its duty to Plaintiff and the Class by allowing the Data Breach to occur;

c. Defendant's existing data monitoring measures do not comply with its obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect the PII of Plaintiff and the Class within Defendant's custody, care, and control; and

d. Defendant's ongoing breaches of said duties continue to cause harm to Plaintiff and the Class.

132. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach or cybersecurity incident. This risk is real, immediate, and substantial. If another data breach or cybersecurity incident occurs, Plaintiff and the Class will not have an adequate remedy at law because monetary relief alone will not compensate Plaintiff and the Class for the serious risks of future harm.

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

133. The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Plaintiff and the Class will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendant's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

134. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach or cybersecurity incident, thus preventing future injury to Plaintiff and the Class and other persons whose PII would be further compromised.

**FOURTH CAUSE OF ACTION**
**Violation of the Unfair Competition Law**
**Bus. & Prof. Code § 17200 *et seq.* ("UCL")**
***(On Behalf of Plaintiff and the Class)***

135. Plaintiff, individually and on behalf of the class, incorporates the above allegations as if fully set forth herein.

136. Plaintiff pleads this claim for equitable relief, including restitution and injunctive relief, in the alternative to her claims for damages.

137. The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

138. Defendant's actions as alleged herein in this Class Action Complaint constitute an "unlawful" practice as encompassed by Cal. Bus. & Prof. Code §§ 17200 *et seq.* because Defendant's actions: (a) constituted negligence; and (b) violated federal law and regulations, including the FTC Act.

139. Defendant's actions as alleged in this Class Action Complaint also constitute an "unfair" practice as encompassed by Cal. Bus. & Prof. Code §§ 17200 *et seq.*, because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious. The harm caused by Defendant's wrongful conduct outweighs any utility of such conduct and has caused—and will continue to cause—substantial injury to the Class, including Plaintiff. There were ample reasonably available alternatives that would have furthered Defendant's legitimate

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

business practices, including using industry-standard technologies to protect data (e.g., two-factor authorization, effective encryption and anonymization, compartmentalization of sensitive data, software patches, limiting how much data any user may access, and the purging of data no longer necessary for Defendant's services). Defendant also unreasonably delayed in notifying Plaintiff and Class Members regarding the unauthorized release and disclosure of their PII.

140. Defendant's conduct also is deceptive in violation of the UCL. Defendant's fraudulent business acts and practices include:

a. Failing to adequately secure the personal information of Plaintiff and Class Members from disclosure to unauthorized third parties or for improper purposes;

b. Enabling the disclosure of personal and sensitive facts about Plaintiff and Class Members in a manner highly offensive to a reasonable person;

c. Enabling the disclosure of personal and sensitive facts about Plaintiff and Class Members without their informed, voluntary, affirmative, and clear consent;

d. Omitting, suppressing, and concealing the material fact that Defendant did not reasonably or adequately secure Plaintiff's and Class Members' personal information.

141. Defendant's omissions were material because they were likely to deceive reasonable consumers about the adequacy of its data security and ability to protect the confidentiality of Plaintiff's and Class Members' PII.

142. The harm from Defendant's conduct was not reasonably avoidable by consumers. Plaintiff and Class Members were required to provide their PII to work with Mercor and/or to use its recruitment platform, and had no reasonable means of discovering that their information would be exposed to hackers through inadequate data security measures.

143. There were reasonably available alternatives that would have furthered Defendant's business interests of electronically transferring its users' and contractors' information while protecting PII.

144. A reasonable person would regard Defendant's derelict data security and the Data Breach as important, material facts that could and should have been disclosed.

145. As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiff lost money or property because her sensitive personal information experienced a

diminution of value and because she devoted additional time to monitoring her financial accounts for fraudulent activity. Plaintiff faces ongoing and impending damages related to theft of her PII.

146. Defendant's wrongful practices constitute a continuing course of unfair competition because, on information and belief, Defendant has failed to remedy the lax security practices or even fully notify all affected California persons. Plaintiff and the Class seek equitable relief pursuant to Cal. Bus. & Prof. Code § 17203 to end Defendant's wrongful practices and require Defendant to maintain adequate and reasonable security measures to protect the PII of Plaintiff and the Class.

147. Plaintiff and Class Members lack an adequate remedy at law because the injuries here include an imminent risk of identity theft and fraud that can never be fully remedied through damages, ongoing identity theft and fraud.

148. Further, if an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury. The risk of another such breach is real, immediate, and substantial. Defendant has still not provided adequate information on the cause and scope of the Data Breach. Plaintiff and Class Members lack an adequate remedy at law that will reasonably protect against the risk of a further breach.

149. Plaintiff and the Class also seek an order requiring Defendant to make full restitution of all monies it received through its wrongful conduct, along with all other relief permitted under Cal. Bus. & Prof. Code §§ 17200 *et seq.*

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class set forth herein, respectfully requests the following relief:

A. Certifying this action as a class action under Fed. R. Civ. P. 23 and appointing Plaintiff and her counsel to represent the Class;

B. Entering judgment for Plaintiff and the Class;

C. Granting permanent and appropriate injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein and directing Defendant to adequately safeguard the PII of Plaintiff and the Class by implementing improved security controls;

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St., Suite 200
San Francisco, CA 94123
(415) 788-4220

D. Awarding compensatory, consequential, and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

E. Award Plaintiff and Class Members statutory or punitive damages as allowed by law in an amount to be determined at trial;

F. Ordering disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of Defendant's unlawful acts, omissions, and practices;

G. Awarding to Plaintiff and Class Members the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

H. Awarding pre- and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper; and

I. Granting such further and other relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all claims so triable.

Dated: April 15, 2026

**SCHUBERT JONCKHEER & KOLBE LLP**

*/s/ Amber L. Schubert*
Amber L. Schubert

Robert C. Schubert (S.B.N. 62684)
Amber L. Schubert (S.B.N. 278696)
Sonum Dixit (S.B.N. 353395)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St., Suite 200
San Francisco, California 94123
Telephone: (415) 788-4220
Facsimile: (415) 788-0161
E-mail: rschubert@sjk.law
aschubert@sjk.law
sdixit@sjk.law

*Counsel for Plaintiff Elana Ramos and the Putative Class*